**In re the Matter of: Stacy J. DUKES, Petitioner,**

v.

**Toby J. BETTS,[1] Respondent.**

**In the Interest of Toby J. Betts DOB: 06.23.92.**

**No. CS93–3761.**

Family Court of Delaware. Sussex County.

Submitted Dec. 8, 2003. Decided Dec. 12, 2003.

1. Pseudonyms have been assigned to the parties and family members to protect their identities.

Stacy J. Dukes, Pro Se, Monroeville, Pennsylvania.

John F. Brady, Georgetown, Delaware, for Jason W. Betts.

HENRIKSEN, J.

On December 8, 2003, the Court held a trial on the motion filed April 8, 2002 by Stacy J. Dukes, formerly known as Stacy J. Grant ("mother"), against Jason W. Betts ("father") seeking to modify their prior Custody Order dated November 8, 1999. In addition to hearing the testimony of each of the parties, the Court also heard testimony from Tom Dawson the child's stepfather; Tori Price the child's fifty (50) year old maternal grandmother who resides in Frankford, Delaware; Jason Betts, Sr., the paternal grandfather; Debbie Betts, the paternal grandmother; and Sharon Oliver, the mother of Aaron Oliver who has been a close friend with Toby since kindergarten, and with whom Toby often skateboards. With the consent of the parties, the Court also interviewed Toby a private tape recorded session.

### BACKGROUND

The parties married on February 6, 1993. The separated in late January, 1994.

On August 24, 1994, with the Order being signed August 25, 1994, the parties entered into a Consent Order which provided joint custody with physical placement of the child with mother. This Order basically provided father with visitation of every other weekend, Wednesday until Friday in alternate weeks, three (3) weeks summer vacation, and a sharing of holidays. At the time of the entry of this Order, both parties resided in Sussex County, Delaware, and neither party had remarried.

The parties were divorced on December 1, 1994.

By Order dated November 8, 1995, a Commissioner of this Court changed visitation to a more conventional scheme of alternating weekends with one (1) evening

each week, noting that most of the prior weekday visitations for father were primarily spent by the child in the care of the paternal grandmother; whereas, mother was home all day with her children. The Commissioner's Order was affirmed by a Judge of this Court in an Order mailed January 30, 1996.

On April 18, 1997, mother filed a motion seeking permission of the Court to relocate. Because father filed no response to the motion, a Judge of this Court granted mother's Motion to Relocate by Order dated May 1, 1997. However, the same Judge reopened the Motion for Relocation based upon father's representation that he had not received a copy of the motion. Father also filed at that time a motion requesting a change of placement. Despite a provision in the parties' Consent Order of August 24, 1999 that stated *"Parties agree that the child will not move out of the State of Delaware without the consent of the other parent or upon Order of the Court"*, mother unilaterally took the child with her to Monroeville, Pennsylvania, a suburb of Pittsburgh, Pennsylvania. This was done despite both parties having filed petitions concerning the possibility of mother's relocation, with both petitions filed in the mid to late summer of 1998. Mother's request for expedited scheduling of her motion to allow her to relocate was denied. Despite the denial, the mother chose to relocate the child with her to the Pittsburgh, Pennsylvania area. As a result, following father's filing of an emergency motion, a Commissioner of this Court granted an Emergency Order awarding temporary sole custody and guardianship of the child to father and requiring mother to return the child to the State of Delaware for placement with father. This Emergency Order was issued October 16, 1998. Mother's Motion for Reargument to the Commissioner was denied on February 8, 1999. Mother's Request for Review of Commissioner's Order of February 8, 1999 was denied by a Judge of this Court on March 31, 1999.

All of the foregoing led to an eventual trial before a Judge of this Court where both parties sought to modify the original 1994 Consent Order based upon mother's relocation to the Pittsburgh, Pennsylvania area. The child was seven (7) years of age at the time of the November 1999 hearing. At that time, the trial Judge found that the child had a good relationship with both parents but expressed an interest in living with his mother. The trial Judge noted, however, that the *"Reasons for that decision were not concrete nor directly related to [the child's] feelings towards his mother over his father."* The Court's decision also commented on mother's lack of cooperation in obeying prior Court Orders which centered around her initial decision to unilaterally take the child to Pennsylvania, and then her less than cooperative approach in returning the child to the State of Delaware. The Court's Order also noted a prior conviction of father for Offensive Touching involving his then wife. However, the Court also noted that father had successfully completed a program of rehabilitation, successfully completed probation, and had committed no additional acts of domestic violence.

The trial Judge's Order of November 8, 1999 also noted that father had remarried, *"... and it appears that his relationship with his present spouse and new child is going well."* The decision also reflected that *"The natural mother also remarried, but is now going through divorce proceedings with her second husband. It appears that the natural mother is the least stable of the parents."*

In summary, it appears that the trial Judge's Order of November 8, 1999, which awarded primary placement to father, honed in on the following critical findings:

1. The seven (7) year old child, although expressing a desire to reside with his mother, was not able to concretely articulate his reasons.

2. At the time, father offered a much more stable environment where he had remarried, and his marriage seemed to be going well; whereas, mother was in the middle of a divorce.

3. Although father had earlier problems with domestic violence, he had gone through the appropriate rehabilitative process, and had no further incidences.

4. Mother had made a major mistake when she took the child to Pennsylvania, thereby defying the Order of the Court, and placing her child in the middle of the turmoil and adjustment pressures, which mother had apparently not considered.

An Order of the Delaware Supreme Court dated June 9, 2000 eventually Affirmed the trial Judge's Order of November 8, 1999.

### LAW, FACTS AND REASONING

Pursuant to Title 13, Section 701(a), a father and mother are the joint natural guardians of their minor children, and are equally charged with their children's support, care, nurture, welfare, and education. Where the parents live apart, it falls upon the Court to determine with whom the children shall primarily reside, and to also set forth the schedule of visitation consistent with the childrens' best interest and maturity, which is designed to permit and encourage the children to have frequent and meaningful contact with both parents.[2] Regardless of who is awarded placement, all parents and other persons are encouraged to foster . . . frequent and meaningful contact, in person, by mail and by telephone, between parents and children . . ."[3] If the Court finds that this obligation is violated, the Court has the power to remedy this violation by awarding, among other things, extra visitation, a temporary transfer of custody or primary residence, a fine, and even, imprisonment.[4]

In making its decision as to the placement of this child, the Court did not presume that one (1) parent, because of his or her sex, was better qualified than the other parent to act as the primary residential parent.[5]

The Court's Order of November 8, 1999 was entered by the Court after a full hearing on the merits. Mother's petition has been filed more than two (2) years after the Court's Order. Accordingly, mother's petition is controlled by Title 13, Section 729(c)(2) which states the following:

If the application for modification is filed more than 2 years after the Court's most recent order concerning these matters, the Court may modify its prior Order after considering:

a. Whether any harm is likely to be caused to the child by a modification of its prior order, and, if so, whether that harm is likely to be outweighed by the advantages, if any, to the child of such a modification;

b. The compliance of each parent with prior orders of the Court concerning custody and visitation and compliance with his or her duties and responsibilities under § 727 of this title including whether either parent has been subjected to sanctions by the Court un-

2. Tit. 13, Section 728(a).

3. Tit. 13, Section 728(b).

4. Ibid.

5. Tit. 13, Section 722(b).

der § 728(b) of this title since the prior order was entered; and

c. The factors set forth in § 722 of this title.

The Court is required to consider each of the factors set forth in the "best interests" section of Title 13, Section 722, as well as any other relevant factors the Court may deem appropriate.

The Court must consider each factor independently and then give each individual factor *"its due weight and importance relative to the other factors in a manner reflecting the best interest of the child in question."* [6] The Court does not adopt a "mechanical or perfunctory approach" whereby each Section 722 factor is weighed equally, and the child's best interests are resolved by placing the child with the parent who prevailed on the most factors.[7]

■ Thus, the Court first must consider whether any harm is likely to be caused to the child by a modification of the prior Order. Father basically proposed that the child is doing well with him, and *"don't try to fix what is not broke."* Father is therefore recommending that the Court maintain the *status quo*. Father did not allege that mother was unable to care for the child. Father's only concern expressed of mother was whether she would be as cooperative in arranging additional visitation with father if she were to get placement as he had been when he had placement. Father also expressed a concern that the child would have to go through a new school and new friends if placement were changed to mother who resided in Pennsylvania. Indeed, the child is presently in the sixth (6th) grade, in a school system where he would remain in the same school through eighth (8th) grade. If the child moves to Monroeville before the end of the year, he would become involved in a new sixth (6th) grade class, and then he would have to go to begin another new school for seventh (7th) grade.

Although all of the parties seemed to suggest that Toby was doing well in school, and all were agreeable to having Toby remain with father until the semester beginning after Christmas, or even until the conclusion of the school year in the spring, the Court's review of Toby's report cards and progress reports caused the Court to think otherwise. From the Court's observation, although not raised by either of the parties, the report cards, especially for Toby's fifth (5th) grade year, and his first (1st) semester of the present year, reflect that Toby is having trouble keeping on top of his assignments and that he is not working up to his potential in some of his subjects, particularly Language Arts and Math. His standardized test performance, when he was tested in March of 2001, demonstrated that he was making unsatisfactory progress in Writing, and at a 79th national percentile in Reading and Math.

The modification language of Title 13, Section 729(c)(2) specifically requires the Court to consider whether any harm is *likely* (emphasis added) to be caused by the modification. It does not say the Court should consider any harm that might conceivably be caused by the modification. In the Court's opinion, father has failed to demonstrate any harm that likely would be caused by the modification. Even if the Court were to consider the conceivable problems that Toby's move to a new school system with new friends would cause to Toby, given the review of Toby's school record, it is just as conceiva-

---

6. *Holmes v. Wooley*, Del.Supr., 2002, Holland, J., Berger, J. and Steele, J., 2002 WL 27436 (Jan. 3, 2002).

7. Ibid.

ble that a new school system with a different parent assisting Toby could improve Toby's school performance. As to father's concern about mother's lack of cooperation in providing extra visitation, the Court will address that concern in the review standard for this Order.

The Court has already noted the lack of compliance of mother with the prior Orders of this Court when she took Toby with her to the Pittsburgh area. Several years have elapsed since those violations, and there have been no further violations against mother. Indeed, testimony reflected that the exchanges of the child have gone well, and both parents are to be congratulated on working hard for Toby's benefit to make these exchanges as least traumatic as possible.

■ The Court then turns its attention to the factors set forth in Section 722 of this title. In making its decision for the proper placement for Toby the Court has considered all relevant factors to determine the best interests of the child, including the following factors set forth in Title 13, Section 722(a):

*Parents' wishes and residential arrangements*: Both parents agreed to maintain joint custody. Each parent would like to have primary placement. It appears that both parents, depending upon who would obtain primary placement, would be content to follow basically the same visitation schedule they have followed in the past. That schedule involves the non-placement parent having the child the entire summer except for two (2) weeks, alternating holidays, and having frequent and liberal visitation when the non-placement parent would choose to travel to the placement parent's geographical area.

Mother is thirty-one (31) years of age. She has remarried for a third (3rd) time. Her present husband is Tom Dawson. Tom works as a bricklayer/stone mason for a union, working the hours of 8:00 a.m. to 4:00 p.m. or 7:00 a.m. to 3:00 p.m. Tom also attends night school in Pittsburgh. Mother is a stay-at-home mother, except for babysitting two (2) days a week. She babysits for the S family, for whom she has babysat for six (6) years. She is able to baby-sit the S children when her children are in school. In the summer time, she takes her children with her to baby-sit, and all of the children play together.

Mother and her husband have been married one (1) year and have been together for five-and-a-half (5–½) years. Toby has known Tom for the five-and-a-half (5–½) years.

Mother did an excellent job in presenting numerous photographs and a map to show the area in which she and Tom reside in Monroeville. There is a big park behind the house where Toby likes to catch snakes. Other relatives live close by. The school where Toby would attend this year is approximately five (5) miles from the home, and next year's school would be approximately one (1) mile from the home. Mother's home is a brick Colonial located on a cul de sac in what appears to be a very attractive suburb of the Pittsburgh area. The home contains four (4) bedrooms and three (3) bathrooms. The photographs reflect, and the maternal grandmother's testimony confirmed, that mother is a wonderful homemaker.

Mother's home is also located just outside of Pittsburgh, where the family takes various educational trips to such things as a museum and also the Pirates baseball games.

Also living with mother and her husband is her eight (8) year old daughter, Mary, who is Toby's half-sister. Mary's father, Mr. Grant, resides in Delaware. Pursuant to a Custody Order concerning Mary, Mary spends two (2) months of each school summer vacation with her father in Dela-

ware. Mother and Mr. Grant basically share holidays. Exchanges for Mary are made at the Wal–Mart store in Frederick, Maryland.

Father resides with his parents in Dagsboro, Delaware. Father's work requires him to work fourteen (14) days a month on a schedule where he works four (4) nights from 6:00 p.m. to 6:00 a.m., followed by three (3) days off, then three (3) days on for a day shift from 6:00 a.m. to 6:00 p.m., then one day off followed by three (3) nights on, and so on. He is guaranteed one (1) week off per month. Father also has additional vacation.

Father was recently divorced in November of 2003. Despite recently divorcing his former wife, Molly, father indicated that he and Molly may be getting back together. Father and Molly have been separated for three (3) years and have not spent the night with each other during those three (3) years. According to father, neither he nor Molly wanted the divorce, but they still obtained the divorce. Father and Molly have a child, six (6) year old Tara, who resides primarily with Molly but often visits with father. Tara is Toby's other half-sister.

The grandparents' home in which father resides is a two (2) story, three (3) bedroom home. Toby has his own room, the grandparents have a room, Tara has her own room when she comes to stay at the house, and father indicated he usually sleeps on the couch.

Just as the trial Judge in the Order of November 8, 1999 noted that father's life appeared to be relatively stable, involved in a happy marriage, while mother's life was unstable at the time where she was in the process of a divorce, it appears we now have exactly the opposite situations. Presently mother appears very happily married and is living with her husband and child in a nice home situated in a nice community. On the other hand, father just obtained a divorce, has not lived with his wife in three (3) years, but says they may still get back together, and father is living in the home of his parents. At this time, mother's environment clearly offers a more stable environment for Toby.

*Child's wishes*: Toby is now eleven (11) years of age. Although he loves both of his parents, he clearly expressed a desire to reside with his mother. Initially, he simply reasoned that he wanted to spend more time with his mother, stepfather, who he enjoys, and his eight (8) year old half sister Mary. He also indicated that he has lots of aunts, uncles and cousins in the Pittsburgh area. Indeed, maternal grandmother was one (1) of eleven (11) children, and most of those children, Toby's aunts and uncles, reside in close proximity to mother's present location. According to mother, each of these aunts and uncles also have between two (2) and five (5) children. They have frequent large family gatherings, and Toby's move to Monroeville would include him in frequent interaction with a sizeable family support system. Upon closer scrutiny of Toby's reasons, he offered that his grandparents mainly take care of him, especially his grandmother, and not his father. He indicated that his father is at work a lot.

Toby also indicated that he was agreeable to changing placement after the Christmas vacation, or even waiting until the end of the school year. If Toby is placed with his mother, he wants to spend most of his summers with his father, but be able to spend some time with his mother.

■ In this Court's opinion, Toby, now five (5) years older than the last hearing, was clearly able to articulate his wishes in this matter. He appeared as a very mature, intelligent and well-spoken young

man. In such a case, Toby's preference is entitled to great weight.[8]

*Interaction and interrelationship of child with significant others*: As already noted, mother lives amongst numerous aunts and uncles, noting that her mother was one (1) of eleven (11) children. The majority of those aunts and uncles, along with their children, reside in close proximity to mother. According to mother's testimony, there are frequent large family get-togethers. In addition, Toby spoke with great fondness for his stepfather, Tom, and Tom spoke equally of his fondness for Toby. There is no question that Tom has an excellent relationship with Toby, and involves him in various activities such as taking him to museums and sporting events. Also important is the close bond that was formed between Toby and his now eight (8) year old half-sister Mary when they were young children. Mother presented many photographs into evidence which demonstrated the closeness between these two (2) young children. This is not to say, however, that Toby also does not have a close relationship with his other half-sister, Tara who visits father on a regular basis. Mary, however, lives primarily with Toby's mother. Tara, on the other hand, does not live primarily with Toby's father, although there still remains the uncertainty as to whether or not Toby's father and Tara's mother will get back together.

Also significant in Toby's life is his paternal grandmother, who, in the Court's opinion, appeared to be the key person caring for Toby, rather than Toby's father. Toby's paternal grandfather is a football coach and teacher at the High School. Although he is certainly there for Toby, the Court found it somewhat unusual that the grandfather, who coaches football, has never thrown the football around with Toby. Grandfather, however, does do other

things which include accompanying father on fishing trips with Toby. When paternal grandfather was asked why his son was still living at home, he indicated his son was "unable to get off on his own" because of attorney's fees he has had to pay over the years and the fact that the cost of buying property has continually increased.

It should also be noted that with grandfather being a high school football coach, he has many late hours. Again, it appeared to the Court that the person primarily and consistently charged with Toby's care, noting also father's rather unusual work schedule, is the paternal grandmother.

Toby's maternal grandmother resides in Frankford, Delaware. Despite the maternal grandmother's close proximity to where father lives, she only visits Toby when Toby's mother comes to stay with her, or when the maternal grandmother visits mother's home in Monroeville, Pennsylvania. It appeared that the relationship between maternal grandmother and father and his side of the family was cordial, but not outgoing. Maternal grandmother has not been made aware of Toby's various school activities to which she might have wanted to attend.

All in all, the Court was impressed with the sizable and loving extended family that will love and support Toby if he goes to live with his mother in Pennsylvania. The Court also believes that mother's ability to be daily involved with Toby would be of great benefit to him. Although father is to be commended for his efforts and involvement with Toby, as is the paternal grandmother, mother's stay-at-home situation simply provides Toby with a greater regular and consistent support system.

*Child's adjustment to home, school and community*: The Court has already

8. *William H.Y. v. Myrna L.Y.*, 450 A.2d 406 (Del.1982).

commented on Toby's report cards and scholastic testing. Toby himself indicated that he would have no trouble making new friends. Although there are conceivable adjustments that Toby will have to make by being placed with mother, there was no showing of any *likely* (emphasis added) harm as referred to in Title 13, Section 729(c)(2)a. Mother introduced pictures of the schools which Toby would attend. Although the photographs only show the outside of the school, they certainly appeared to be well structured. Mother was prepared to introduce a copy of the curriculum of the school system, but the Court disallowed entry of that document into evidence based upon father's objection. The Court has no reason to believe, however, that the schools in Monroeville, Pennsylvania do not provide adequate education. The Court is also of the belief that mother's regular involvement with Toby because she is a stay-at-home mother, may be most helpful to Toby's involvement in extracurricular activities besides simply skateboarding, and also will be important in directing Toby towards completing his homework assignments and arranging meetings with teachers on a regular basis to be sure that Toby's progress is being regularly monitored.

The Court was impressed by mother's ability, as a *pro se* party, to present in an orderly fashion an excellent case. Mother showed a level of organization and appropriate presentation seldom seen of a *pro se* client in this Court. In addition to applauding mother for her presentation, the Court gained added confidence in mother's ability to prove an able guiding light to assisting her son in improving his educational endeavors.

*Mental and physical health*: The parties indicated that each of them and Toby were all in good health.

*Past and present compliance of both parents with their rights and responsibilities to their child under Title 13, Section 701*: Pursuant to Title 13, Section 701, parents are equally charged with their childrens' support, care, nurture, welfare and education. In addition, as the Court noted at the beginning of this opinion, each parent has the responsibility to encourage their child to have significant and meaningful contact with the other.

Although there was some discussion that mother does not pay child support, it was clear that father had not pursued child support because mother contributes considerably to buying Toby's clothing, certain school items, and half of the cost of his skateboard. Mother complained that father has not provided her with regular copies of Toby's report cards or medical records, nor has father provided mother with a copy of the medical insurance card. Although father stated that mother had not requested this information, including not requesting a medical card, the Court is concerned that father had the ability to send this information to mother and appears not to have done so. The Court is especially concerned that father knew he could get an extra medical card, but did not provide this to mother so that she would have had it available in the event Toby had been injured while with mother.

The parents also have a responsibility of acting as appropriate role models for their children. In December of 2001, father pled guilty to Driving While Under the Influence. This occurred on a late Thursday evening carrying over into the early Friday morning, which was a school day for Toby. Fortunately, Toby was not with father at the time. Father has a prior history in 1994 of having made a First Offenders election to a Driving While Under the Influence charge. Although father indicated that he does not have a problem with alcohol, his record poses some concern for the Court. The Court, however,

notes that father has not had any additional violations now for two (2) years.

*Evidence of domestic violence*: Since the last hearing, there have been no acts of domestic violence.

### CONCLUSION AND ORDER

Based upon all of the foregoing, the Court believes that it is in the best interests of Toby Betts to grant mother's request for a modification of custody whereby the parties shall retain joint custody, but primary placement of Toby shall be changed to his mother. At this time in Toby's life, placement with mother offers Toby the most stable environment as well as a parent who has the most available time to provide consistent attention to Toby. Before reviewing the school report cards, this Court had intended not to change Toby's placement until the conclusion of the school year in June of 2004. However, the Court's review of Toby's report card from last year, and also the present semester, demonstrate that a change at this time would not be harmful to Toby; but, instead, may be helpful. Presently, Toby is a B to C student. His teachers indicate that in certain courses his work has been unsatisfactory, needs improvement, and that he is not working up to his potential. It is the Court's hope and belief that a regular hands-on approach by a stay-at-home mother may assist Toby greatly at this time in improving his education. Toby was not concerned about needing to meet new friends, and the Court is not concerned. In addition to what the Court perceives as Toby's ability to meet new friends, Toby will also be involved in a very large close-knit extended family with whom he has already had significant contacts. At the same time, the Court believes that father has always been fair in seeing that Toby could be with his mother as much as possible, and the Court intends to be sure that mother continues that same policy with father.

Accordingly,

**IT IS HEREBY ORDERED:**

1. Mother's Motion to Modify Custody is hereby **GRANTED**. The parties shall continue to share joint custody, but primary placement shall be held by mother. This Order will become effective December 24, 2003 at 12:00 noon.

2. Should either party desire to file a modification of this Order, such modification will be controlled by the modification standards set forth in Title 13, Section 729(c), which requires a higher burden of review within two (2) years, but after two (2) years, follows the same standard as the Court has followed in this hearing. However, the Court will entertain within a two (2) year period, on a best interest standard as set forth in Title 13, Section 722, a request for modification by father where the basis of that modification is found to be that mother is denying father reasonable and liberal visitation with the child according to the terms of this Order. It is the Court's intent by this provision that father shall continue to have frequent and meaningful access to his child both in Delaware during times of visitation, and also in the Pittsburgh area if father chooses to travel there.

3. Father's visitation shall be as follows:

   a. For Christmas 2003, as well as Christmas 2004, and even-numbered years thereafter, the child shall be with father from 12:00 noon on December 24th until 12:00 noon on December 28th. Beginning December 2005, and all odd-numbered years thereafter, father shall be entitled to Christmas visi-

tation with the child from 12:00 noon on December 28th until 12:00 noon on January 1st.

b. Father shall be entitled to Thanksgiving visitation with the child in odd-numbered years with said visitation to begin at 12:00 noon on Thanksgiving Day and continuing until 12:00 noon on the following Sunday.

c. Father shall be entitled to visitation with the child each year from 12:00 noon on what is traditionally known as Good Friday until 12:00 noon the Sunday following Easter Sunday. If, however, this conflicts with the child's school schedule, and the child's Easter/Spring vacation occurs at a different time, father's visitation in each year shall then be from 12:00 noon on the Saturday immediately following the closing of school until 12:00 noon immediately preceding the recommencement of school.

d. For all summers beginning with the summer of 2004, father shall be entitled to two (2) months of summer visitation with the child. Beginning on the first weekend that the child's school year is completed, he shall be entitled to a thirty (30) day period of visitation. Then, mother shall be entitled to a fourteen (14) day period of visitation with the child. Then, father shall be entitled to another thirty (30) day period of visitation with the child. Each visitation period shall begin and end at 12:00 noon on the appropriate days.

e. All pick up and delivery of the child shall occur at the Wal–Mart store in Frederick, Maryland, or such other place as the parties can mutually agree upon.

f. Father shall also be entitled to any other times that father is within a fifty (50) mile radius of Monroeville, Pennsylvania upon giving mother forty-eight (48) hours notice. These times must be mutually agreed upon by the parties, but mother shall not unreasonably withhold her consent.

g. The minor child and father shall have frequent telephone and letter contact.

4. Father shall assist mother in any requests she may have in transferring copies of all of the child's medical records to mother so that she may make them available to doctors in her area. Likewise, mother shall keep father apprised of all significant events in T's life, including, but not necessarily limited to, his medical, dental or psychological experiences and records, his school records, including report cards and interim grade and progress reports, as well as the schedule of his school activities and extracurricular activities, as well as providing father the opportunity in each year to obtain school photographs, if the school provides for the same, with father paying for his portion of the photographs.

5. It should be noted that the above visitation schedule is intended to facilitate the exchanges of both Mary and Toby, both of whose fathers are located in the State of Delaware. Although the Court makes no Order as to Mr. Grant, it is also hoped that father, when having Toby for visitation during the summer, will attempt to coordinate some time with Mr. Grant so that Toby can spend time with Mary.

**IT IS SO ORDERED** this 12th day of December, 2003.